UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARY C. HARRINGTON, | ) | Case No. 3:20–CV–00852–JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

**I.     Introduction**

Mary Harrington, Plaintiff, seeks judicial review of the final decision of Andrew Saul, the Commissioner of Social Security. The Commissioner denied Harrington's application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the ALJ failed to follow proper procedures, her decision is not supported by substantial evidence. Therefore, I recommend that the Commissioner's final decision be REVERSED and REMANDED for further proceedings under Sentence Four of § 405(g).

**II.     Procedural History**

Harrington applied for disability insurance benefits and supplemental security income on August 29, 2016. (ECF No. 12, PageID #: 88). She alleged a period of disability beginning on August 9, 2016. (ECF No. 12, PageID #: 88). The Ohio Division of Disability Determination (the "State Agency") denied her claim on initial consideration on February 7, 2017, and again on reconsideration on December 14, 2017. (ECF No. 12, PageID #: 88). Harrington then requested a hearing before an ALJ. (ECF No. 12, PageID #: 88). On February 20, 2019, ALJ Mary Morrow

presided over Harrington's hearing. (ECF No. 12, PageID #: 88). Harrington appeared through counsel Joan H. Rife and testified. (ECF No. 12, PageID #: 124–43). Shawna McCullah testified as an impartial vocational expert. (ECF No. 12, PageID #: 143–49).

The ALJ issued her decision on April 5, 2019, finding that Harrington was not disabled under the Social Security Act. (ECF No. 12, PageID #: 88–108). Thereafter, Harrington asked the Appeals Council to review and set aside the ALJ's decision. On March 9, 2020, the Appeals Council denied Harrington's request. (ECF No. 12, PageID #: 74–77). This timely appeal followed. (ECF No. 1). Harrington raises four issues here:

1. Were all of the severe impairments identified and considered?
2. Was the treating physician rule properly applied?
3. Was Ms. Harrington's testimony properly assessed?
4. Has the burden of establishing alternative jobs been carried?

(ECF No. 14, PageID #: 1572). Harrington filed her merits brief on December 14, 2020. (ECF No. 14). The Commissioner responded on January 29, 2021. (ECF No. 16). Harrington replied on February 12, 2021. (ECF No. 17).

**III.     Relevant Background**

The ALJ's factual recitations of the hearing testimony and medical evidence generally provide sufficient for this R&R. The Court has augmented those summaries where the parties have addressed additional evidence outside of them.

**A.     Hearing Testimony**

**1.     Harrington's Supporting Documents and Testimony**

The ALJ summarized the relevant allegations from Harrington's filings and testimony from Harrington's hearing:

> The claimant initially alleged disability due to neurocardiogenic syncope, fibromyalgia, obsessive compulsive disorder, generalized anxiety disorder, unspecified back issues, and irritable bowel syndrome (3E). The claimant endorsed a general worsening in her condition on appeal (6E, 8E). As a consequence of these conditions, the claimant said that she had general problems with anxiety, balancing, preparing meals, remembering to take her medication, going out alone, driving, handling money, lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, seeing, completing tasks, concentrating, understanding or following instructions, using her hands, getting along with others, and handling stress or changes in her routine. At the same time, however, the claimant admitted that she remained capable of caring for her personal hygiene, performing light household chores, shopping in stores, reading, assisting in the care of pets, participating in social activities, and getting along with authority figures (4E). Then, at the hearing, the claimant testified that she had diffuse pain, fatigue, and stiffness throughout her joints such that she was unable to walk more than one block, stand for more than five minutes at a time, sit more than 10 minutes at a time, and use her bilateral upper extremities. The claimant further testified to an ongoing history of syncope with loss of consciousness as well. She again conceded that she could care for her personal hygiene independently, use her cell phone, prepare simple meals, and perform some range of household chores. The undersigned also notes that the claimant did not appear with any assistive devices, suggesting that she does not require one (Hearing Testimony).

(ECF No. 12, PageID #: 97–98).

Additionally, at the hearing, the ALJ and Harrington discussed Harrington's chronic vomiting, an impairment which the ALJ found to be nonsevere. Harrington indicated that she had vomited the morning of the hearing and that she had almost vomited before entering the hearing, too. (ECF No. 12, PageID #: 138). She also said that she vomits "[e]very day" in patches, and that she dry heaves frequently, too, "which is more painful" than merely vomiting. (ECF No. 12, PageID #: 138). Harrington also stated that her chronic nausea affects her blood pressure, which, in turn, increases her syncope-related dizziness. (ECF No. 12, PageID #: 138). And when Harrington stated that her "stomach [wa]s really upset" during the hearing, the ALJ reasonably

3

offered to Harrington a trash can—the ALJ also told Harrington that she could request an unscheduled break at any point during the hearing. (ECF No. 12, PageID #: 130).

### 2. Vocational Expert's Testimony

The ALJ also summarized the vocational expert's opinion:

> To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:
>
> 1. inspector and hand packager, DOT Code 559.687-074, SVP 2, light and unskilled work, of which there are 10,000 such jobs in the national economy;
>
> 2. garment folder, DOT Code 789.687-066, SVP 2, light and unskilled work, of which there are 24,000 such jobs in the national economy; and,
>
> 3. merchandise marker, DOT Code 209.587-034, SVP 2, light and unskilled work, of which there are 97,000 such jobs in the national economy.
>
> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

(ECF No. 12, PageID #: 107).

The ALJ also sought testimony concerning the "tolerance for being off-task in the national economy," to which the vocational expert replied that "anyone who would be off-task more than 13% of an eight-hour work day would be precluded from all work in the national economy." (ECF No. 12, PageID #: 146). And the ALJ sought testimony concerning "the tolerance for absenteeism," to which the vocational expert replied that "anyone who would miss more than one unscheduled day per month, or consecutively, would be precluded from employment. [After t]he

4

first unscheduled absence, they would receive a verbal warning or counsel[ing]. [After t]he second time[, there] would be a written warning. And [after] the third time, they would likely be terminated." (ECF No. 12, PageID #: 146).

### B. Medical Evidence

The medical records of Harrington's mental symptoms are not relevant to the Court's conclusion below. Thus, the Court here restates only the ALJ's summary of Harrington's physical conditions:

> [T]he claimant was diagnosed with mild, intermittent, and uncomplicated asthma as early as November 2015 (19F/7-8). The claimant later reported apparent episode of syncope and collapse on at least two occasions in March 2016 (2F, 3F/28). She was subsequently diagnosed with bronchitis with history of asthma in May 2016 (4F/5-6). The claimant endorsed similar symptoms on presentation to the hospital in June 2016 despite again displaying no acute symptoms (3F/20). Even so, the claimant once again complained of separate episode of near syncope on return to the hospital in July 2016 accompanied by subjective issues balancing (3F/5). Yet, as before, the claimant was wholly normal on in-person evaluation (3F/6). Notwithstanding, the undersigned is mindful that the claimant was diagnosed with neurocardiogenic syncope that same July (3F/8). Additional medical evidence dated before the alleged onset date are otherwise unremarkable at this stage of the analysis (1F, 2F, 3F, 4F, 5F, 19F).
>
> In any event, the record shows that the claimant was explicitly diagnosed with bilateral hearing loss in October 2016, after the alleged onset date (4F/7-8, 19F/ 13). The undersigned further notes that the claimant was diagnosed with cervical spinal stenosis elsewhere that same month despite displaying entirely normal coordination, gait, and range of motion throughout (5F/40). Then, in November 2016, MRI of the claimant's cervical spine confirmed the presence of degenerative disc disease and uncovertebral and posterior spurring at the CS through C7 levels with canal and bilateral lateral recess narrowing (5F/5-6). The claimant further endorsed persistent lightheadedness, shortness of breath, and wheezing that same November. She once again exhibited no apparent physical or psychological symptoms (18F/42). In addition, a January 2017 MRI of the claimant's lumbar spine failed to identify any active processes (8F/12, 9F/3). Despite this, it appears that the

>claimant underwent bilateral facet blocks to the C3 through C5 levels in early February 2017 (9F/27). The undersigned also recognizes that the claimant reported occasional use of a cane for ambulation in May 2017 due to apparent worsening in her neck pain radiating into her bilateral upper extremities (12F/1-4). Somewhat consistently, the claimant ostensibly exhibited some reduced strength of the bilateral hands that February (12F/7). Consistently, the claimant ultimately underwent successful anterior cervical discectomy and fusion at the C5 through C7 levels with placement of [a] cage due to cervical herniated disc and degenerative disc disease at the same aforementioned levels in mid May 2017 (12F/8-10). She was described as having mild persistent asthma that same May as well (12F/15). Yet, importantly, the claimant subsequently admitted to making good progress with respect to her neck pain on follow-up in June 2017, and even denied any symptoms in her bilateral upper extremities on similarly routine follow-up appointment that July (24F/4-5). Even so, an August 2017 MRI of the claimant's lumbar spine thereafter revealed multilevel, albeit mild, degenerative changes throughout her T12 to S1 levels (15F/11). Tellingly, however, the undersigned emphasizes that the claimant's treating physician reviewed said MRI later that same month and remarked that there was 'no significant degenerative disc disease' (24F/3). No other apparent changes were identified in the claimant's existing hardware on [a] CT scan of her cervical spine in December 2017 (24F/2). A September 2018 x-ray of the claimant's cervical spine was similarly negative for any apparent changes in her existing degenerative disc disease such that she was noted as having only mild residual stenosis about the C5 through C7 levels status post surgery (24F/1, 9). An October 2018 MRI of the claimant's lumbar spine once again revealed no more than mild bone marrow edema indicative of bilateral sacroiliitis as well (25F). Then, as recently as March 22, 2019, the claimant's longtime examining physician examined the claimant and found that the latter tested positive for 19 out of 19 tender points resulting in explicit diagnosis of fibromyalgia (33F). She was simultaneously normal with respect to range of motion throughout, muscle strength, sensation, and gait (33F/2).

(ECF No. 12, PageID #: 98–99).

The medical record also indicates that Harrington suffered from chronic vomiting. Harrington has frequently and consistently presented to providers with abdominal pain, vomiting, and nausea. (*E.g.* ECF No. 12, PageID #: 477, 487, 498, 527, 675, 953, 997, 1074, 1105, 1226,

6

1233, 1307, 1313). At an April 2017 visit, Harrington stated that her pain and vomiting had already persisted for sixteen years. (ECF No. 12, PageID #: 1105). In attempts to narrow down the cause of her vomiting and nausea, Harrington has limited her diet, participated in a fluid challenge, and undergone a gastroscopy procedure. (*E.g.* ECF No. 12, PageID #: 498, 527, 997). She treats her nausea with "large doses of Phenergan" "but complains [that] this makes her sleepy." (ECF No. 12, PageID #: 1313). At a May 6, 2017 emergency visit, a provider noted that Harrington stated that she had vomited 10 times in the last 24 hours—and that that was "normal" for her. (*E.g.* ECF No. 12, PageID #: 1226).

## IV. The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact and narrative analysis:

> 3. The claimant has the following severe impairments: neurocardiogenic syncope, asthma, degenerative disc disease of the cervical spine status-post cervical spine fusion, bilateral sacroiliitis, hearing loss, fibromyalgia, major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, and social anxiety disorder…
>
> [T]he record reflects the presence of mild degenerative disc disease of the lumbar and thoracic spine mild chronic gastritis, irritable bowel syndrome, hiatal hernia, grade B esophagitis, ingrown toenail, nonalcoholic steatohepatitis, iron deficiency, and chronic vomiting (9F, 16F, 26F, 3 IF). Notwithstanding, the medical record as a whole fails to show that any of the aforementioned conditions, considered singly or in combination, have more than a minimal impact on the claimant's ability to carry out even minimal work activities. They are therefore nonsevere as set out in the regulations. Somewhat similarly, the undersigned recognizes that the record suggests the claimant has several other conditions, including the following: Tietze's disease, vasovagal syncope, obesity, vitamin D deficiency, cellulitis, otalgia, and conjunctivitis. Yet, again, there is insufficient evidence to medically determine the existence of these conditions within the definition of the disability regulations.
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1…

7

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and the following: the claimant can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and crawl; and, occasionally stoop, kneel, and, crouch. She can never be exposed to concentrated levels of extreme cold, fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants; and, can never be exposed to hazards such as moving machinery and unprotected heights. She is limited to performing simple and moderately complex tasks, but not at a production rate pace so, for example, no assembly line work. She can respond appropriately to occasional interaction with supervisors and co-workers, but can have no interaction with the general public. Finally, she is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting…
>
> 6. Through the date last insured, the claimant was unable to perform any past relevant work…
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform…
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from August 9, 2016, through the date of this decision…

(ECF No. 12, PageID #: 91–108).

## V.   Law and Analysis

### A. Standard of Review

The Court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "It is well

established that the party seeking remand bears the burden of showing that a remand is proper…" *Oliver v. Sec'y of Health and Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475–76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference…"). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."). Thus, the movant bears the burden of demonstrating that the ALJ's analysis *lacks* substantial evidence, not merely that substantial evidence supports her position, too. *See Greene ex rel. Greene v. Astrue*, No. 1:10–CV–414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack of substantial evidence by pointing to evidence … that supports her position. Rather, [a claimant] must demonstrate that there is not sufficient evidence … that would allow a reasonable mind to accept the ALJ's conclusion.").

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ

9

failed to apply proper legal standards, *i.e.*, "fails to follow its own regulations," unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is not harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* And the court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District Courts follow *Sarchet*'s logical-bridge requirement[1] because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir.

---

[1] *E.g. Shrader v. Astrue*, No. 11–13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10–CV–734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10–CV–017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09–CV–19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

> B. **The ALJ Properly Considered Harrington's Vasovagal Syncope, Degenerative Disc Disease, and IBS but Failed to Considered Harrington's Chronic Vomiting After Step Two**

Harrington first argues that the ALJ "failed to consider many of Ms. Harrington's conditions" after Step Two. (ECF No. 14, PageID #: 1586). The ALJ found that Harrington had many nonsevere impairments. (ECF No. 12, PageID #: 91). Of those nonsevere impairments, Harrington claims that the ALJ erred in her analysis of only four of them: (1) degenerative disc disease of the lumbar and thoracic spine;[2] (2) chronic vomiting; (3) irritable bowel syndrome; and (4) vasovagal syncope.[3] (ECF No. 14, PageID #: 1587). Harrington asserts that even if the ALJ properly found that these impairments were nonsevere, the ALJ nevertheless erred by not properly considering their effects at subsequent steps in the sequential evaluation process. (ECF No. 14, PageID #: 1586–87).

The Commissioner generally responds that Harrington has "provide[d] no legal or factual support for her contention that these impairments were severe"—and that it is her burden to do so. (ECF No. 16, PageID #: 1605 (citing *Rabbers*, 582 F.3d at 652)). Concerning Harrington's vasovagal syncope, the Commissioner argues that the ALJ found that it is a severe impairment

---

[2] Harrington broadly states that the ALJ erred in failing to find her "conditions such as DDD …" to be nonsevere impairments. (ECF No. 14, PageID #: 1587). But the ALJ expressly found that Harrington's cervical degenerative disc disease was a severe impairment and that her degenerative disc disease of the lumbar and thoracic spine was nonsevere. (ECF No. 12, PageID #: 91). Thus, the Court construes Harrington's degenerative-disc-disease argument as an objection only to the ALJ's consideration of Harrington's lumbar and thoracic degenerative-disc-disease diagnoses.

[3] Harrington expressly "concedes that she likely does not have Tietze's Disease and some of the other conditions either were of short duration or not severe as defined." (ECF No. 1587). Thus, the Court does not analyze the ALJ's finding that they are nonsevere impairments.

11

because that condition is synonymous with neurocardiogenic syncope, which the ALJ expressly found to be a severe impairment. (ECF No. 16, PageID #: 1605). Concerning Harrington's lumbar and thoracic degenerative disc disease, the Commissioner combines Harrington's various degenerative disc disease diagnoses, arguing that "the ALJ determined that Plaintiff's degenerative disc disease was severe[,] and [the ALJ] discussed the impairment throughout her decision (Tr. 18–26)." (ECF No. 16, PageID #: 1605). Concerning Harrington's irritable bowel syndrome (IBS), the Commissioner argues that the ALJ expressly considered it at each subsequent step in the sequential evaluation process, thereby satisfying her duty under Sixth Circuit case law. (ECF No. 16, PageID #: 1605–06 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987))). And concerning her chronic vomiting, the Commissioner argues that the objective medical evidence does not support a finding that Harrington's chronic vomiting is a severe impairment or that it warranted "further limitations than those already accounted for by the ALJ in the RFC." (ECF No. 16, PageID #: 1606 (citing *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988))). The Commissioner does not argue that the ALJ considered Harrington's chronic vomiting later in the sequential evaluation process.

Upon careful review of the record, the Court agrees with Harrington that the ALJ failed to consider her chronic vomiting at subsequent steps in the sequential evaluation process. Accordingly, as explained below, remand is required.

> 1. **Any Error at Step Two Is Legally Irrelevant and Does Not Compel Remand**

"In the Sixth Circuit, the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and

experience." *Id*. "The goal of the test is to 'screen out totally groundless claims.'" *Id*. (quoting *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir. 1985)).

The ALJ found that Harrington suffered numerous severe impairments: "neurocardiogenic syncope, asthma, degenerative disc disease of the cervical spine status-post cervicaal spine fusion, bilateral sacroiliitis, hearing loss, fibromyalgia, major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, and social anxiety disorder." (ECF No. 12, PageID #: 91). Therefore, Harrington "cleared step two of the analysis." *Anthony,* 266 F. App'x at 457. "This caused the ALJ to consider [Harrington's] severe and nonsevere impairments in the remaining steps of the sequential analysis. The fact that some of [Harrington's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id*. (citing *Maziarz*, 837 F.2d at 244 (holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe)). The ALJ, therefore, did not commit reversible err at Step Two. *Id*.

### 2. The ALJ Properly Considered Harrington's Vasovagal Syncope, Lumbar and Thoracic Degenerative Disc Disease, and IBS in Subsequent Steps of the Sequential Evaluation Process

The Court's Step Two conclusion, though, does not end the inquiry. "When formulating an RFC, an ALJ must consider the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Kochenour v. Comm'r of Soc. Sec. Admin*., No. 3:14–CV–2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (quotation marks and alteration omitted) (citing *LaRiccia v. Comm'r of Soc. Sec*., 549 F. App'x 377, 388 (6th Cir. 2013) ("[T]he ALJ's assessment of residual functional capacity reflects a claimant's functional capacity in light of all his limitations, not just those that are severe.")). The ALJ must do so because

> [w]hile a 'not severe' impairment[] standing alone may not significantly limit an individual's ability to do basic work activities,

13

> it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

*Patterson v. Colvin*, No. 5:14–CV–1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) (citations omitted). Said differently, "'an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment … does not impose any work-related restrictions.'" *Kochenour*, 2015 WL 9258609, at *6 (quoting *Patterson*, 2015 WL 5560121, at *4).

Looking first to Harrington's vasovagal syncope, the Commissioner correctly states that vasovagal syncope is "also called cardio-neurogenic syncope"[4] and that the ALJ expressly found Harrington's neurocardiogenic syncope to be a severe impairment. (ECF No. 12, PageID #: 91). Even though the ALJ also expressly stated that Harrington's vasovagal syncope was a nonsevere impairment, the ALJ nevertheless discussed Harrington's cardio-neurogenic- or vasovagal syncope-related symptoms in the RFC analysis. (*E.g.* ECF No. 12, PageID #: 98, 102–06). She also expressly limited Harrington to no moving machinery or unprotected heights because of her syncope symptoms. (ECF No. 12, PageID #: 97, 105). Thus, the Court concludes that the ALJ properly considered Harrington's vasovagal syncope.

The ALJ also properly considered Harrington's thoracic and lumbar degenerative disc disease. Although the ALJ addressed Harrington's cervical, thoracic, and lumbar degenerative-disc-disease diagnoses separately—finding that Harrington's cervical degenerative disc disease

---

[4] *Syncope*, CLEVELAND CLINIC FOUND., https://my.clevelandclinic.org/health/diseases/17536-syncope (last reviewed May 14, 2019); *see also Vasovagal Syncope*, CEDARS SINAI, https://www.cedars-sinai.org/health-library/diseases-and-conditions/v/vasovagal-syncope.html (last visited July 6, 2021) ("[Vasovagal syncope] is also called neurocardiogenic syncope...").

was a severe impairment while her thoracic and lumbar disc disease were nonsevere impairments—the ALJ nevertheless expressly stated that she considered Harrington's claim under Listing 1.04(C), which concerns "a disorder of the spine resulting in the compromise of a nerve root or the spinal cord with lumbar spinal stenosis resulting in pseudoclaudication, manifesting as chronic nonradicular pain and weakness accompanied by an inability to ambulate effectively."[5] (ECF No. 12, PageID #: 92). And in discussing the RFC, the ALJ detailed the evidence concerning Harrington's lumbar spinal pain, imaging results, and treatment plan. (ECF No. 12, PageID #: 98–99). The ALJ also noted that that imaging consistently revealed only mild degenerative changes of the lumbar spine. (ECF No. 12, PageID #: 98–99). Thus, the Court concludes that the ALJ properly considered Harrington's lumbar degenerative disc disease.

The Court recognizes that the ALJ did not explicitly discuss Harrington's thoracic degenerative disc disease at subsequent steps. But remanding for a more explicit discussion of Harrington's thoracic degenerative disc disease "would be an idle and useless formality" (*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)) because there is little evidence to support a RFC limitation. Indeed, Harrington's own factual recitation mentions her thoracic spinal issues only twice, once to note that she received "cervical/thoracic epidurals on February 11, 2015 and February 25, 2015," and the other to state that her "thoracic and lumbar MRI's were 'unremarkable.'" (ECF No. 14, PageID #: 1573, 1579). It is Harrington's burden to produce evidence that demonstrates the "existence and severity of limitations caused by her impairments" during the decision-making process. *Jones*, 336 F.3d at 474. She has not done so. Thus, any error here would be, at most, harmless error because Harrington has not explained how the ALJ's finding

---

[5] The ALJ found that Harrington did not meet that (or any other) listing (ECF No. 12, PageID #: 92–93), a finding that Harrington has not objected to.

15

prejudiced her on the merits or deprived her of a substantial right. *Bowen*, 478 F.3d at 746.

Finally, the ALJ properly considered Harrington's IBS. The ALJ stated that she considered whether Harrington's bowel difficulties met Listing 5.06 at Step Three, finding that they did not. (ECF No. 12, PageID #: 92–93). The ALJ then stated that Harrington had listed her IBS as a disabling condition when she applied for disability insurance benefits and supplemental security income. (ECF No. 12, PageID #: 97 (citing exhibit 3E)). As with her thoracic degenerative disc disease, Harrington has not demonstrated that her IBS could warrant any additional RFC restrictions, [6] and it is her burden to do so. *Jones*, 336 F.3d at 474. Thus, the Court concludes that the ALJ properly considered Harrington's IBS.

### 3. The ALJ Failed to Consider Harrington's Chronic Vomiting After Step Two, Which Was Not Harmless Error

But the Court concludes that the ALJ failed to properly consider Harrington's chronic vomiting—and that that error requires remand. In responding to Harrington's argument that the ALJ should have found her chronic vomiting to be a severe impairment, the Commissioner argues that the objective medical evidence does not support this claim. (ECF No. 16, PageID #: 1606). The Commissioner points specifically to Harrington's adult function report, noting that Harrington "never claimed of chronic vomiting" on that report. (ECF No. 16, PageID #: 1606). Unlike with Harrington's syncope, degenerative disc disease, and IBS, the Commissioner does not point to instances in which the ALJ explicitly considered Harrington's chronic vomiting at subsequent steps in the sequential evaluation process.

---

[6] Harrington does discuss her IBS in her factual recitation. (*See* ECF No. 14, PageID #: 1573, 1580). But each page that she cites discusses only her history of IBS or the medications with which she treats it. (*E.g.* ECF No. 14, PageID #: 1573 (citing PageID #: 455, 1330); ECF No. 14, PageID #: 1580 (citing PageID #: 154)). These facts are unavailing because the mere diagnosis of a condition "says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863.

But in her reply brief, Harrington correctly states that "[t]he record is replete with reference to this condition and how it impacts her." (ECF No. 17, PageID #: 1624). And she argues that "[h]er history of nausea and vomiting speaks to whether she could remain on task and be consistently at work…," which matters because "the vocational expert (VE) testified that employers tolerate no more than 13% off task performance and one absence per month." (ECF No. 17, PageID #: 1625).

The record demonstrates that Harrington has frequently and consistently presented to providers with abdominal pain, vomiting, and nausea. (*E.g.* ECF No. 12, PageID #: 477, 487, 498, 527, 675, 953, 997, 1074, 1105, 1226, 1233, 1307, 1313). As of April 2017, Harrington's pain and vomiting had already persisted for sixteen years. (ECF No. 12, PageID #: 1105). To try to narrow down the root cause of her chronic vomiting, Harrington has limited her diet, participated in a fluid challenge, and undergone a gastroscopy procedure. (*E.g.* ECF No. 12, PageID #: 498, 527, 997). She takes "large doses of Phenergan" to treat her nausea "but complains [that] this makes her sleepy." (ECF No. 12, PageID #: 1313). Her vomiting has caused her to visit the emergency department; at one such visit, the treatment provider noted that Harrington had stated that she had vomited 10 times in the last 24 hours—and that that frequency was "normal" for her. (*E.g.* ECF No. 12, PageID #: 1226). Moreover, the ALJ directly asked Harrington about her chronic vomiting at the hearing. Harrington stated that she had vomited *that morning* before attending the hearing— and that she had almost vomited again before entering the building. (ECF No. 12, PageID #: 138). Harrington further testified that she vomits "[e]very day" in patches, and that she dry heaves frequently, too, "which is more painful." (ECF No. 12, PageID #: 138). Harrington also stated that her chronic nausea affects her blood pressure, which, in turn, increases her syncope-related dizziness. (ECF No. 12, PageID #: 138). And when Harrington stated that her "stomach [wa]s

17

really upset" during the hearing, the ALJ reasonably told Harrington to ask for unscheduled breaks during the hearing if her nausea worsened. (ECF No. 12, PageID #: 130).

But other than noting that the she "is further aware that the record reflects the presence of … [various other impairments] and chronic vomiting," the ALJ does not mention Harrington's chronic vomiting or nausea in her decision. Nor does she discuss how Harrington's chronic vomiting its symptoms affect Harrington's functional limitations at Step Two, or after it. And the Commissioner all but concedes as much. (*Compare* ECF No. 16, PageID #: 1605 (citing the various times that the ALJ explicitly discussed Harrington's syncope, degenerative disc disease, and IBS after Step Two) *and* ECF No. 16, PageID #: 1606 (arguing only that the objective medical evidence does not support finding this to be a severe impairment without citing the ALJ's decision)). Even though the ALJ stated that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," because the ALJ omitted any discussion of this evidence, a subsequent reviewer cannot follow the ALJ's logic in fashioning Harrington's RFC. *Fleischer*, 774 F. Supp. 2d at 877. Indeed, if Harrington's chronic vomiting affects her ability to remain on task or to show up to work consistently in the manner that she alleges, then, as the vocational expert stated, Harrington would be outside of the tolerances for absenteeism and being off-task. (ECF No. 12, PageID #: 146). Thus, it is necessary for the ALJ to demonstrate that she considered Harrington's chronic vomiting—whether as a severe or non-severe impairment—when fashioning the RFC. *Kochenour*, 2015 WL 9258609, at *6.

Moreover, the fact that the ALJ failed to discuss the functional limitations (if any) of this nonsevere impairment at Step Two materially distinguishes Harrington's case from the Sixth Circuit's recent decision in *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844 (6th Cir. 2020). There,

18

the Sixth Circuit noted that the ALJ had expressly stated that her decision was controlled by SSR 96–8p. *Emard*, 953 F.3d at 851–52. The Sixth Circuit then noted that "[d]istrict courts in this circuit have held that an ALJ need not specifically discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96–8p." *Id.* But the Sixth Circuit clarified that "t]he ALJ's express reference to SSR 96–8p, *along with her discussion of the functional limitations imposed by Emard's nonsevere impairments at step two of her analysis*, fully support our conclusion that the ALJ complied with 20 C.F.R. § 416.945(e) and SSR 96-8p." *Id.* at 852 (emphasis added). Other jurists in this District have noted that *Emard* requires an ALJ to do more than merely state that SSR 96–8p controls their analysis; they must also expressly discuss how the claimant's nonsevere impairments functionally limit the claimant (if at all) in their Step Two analysis. *E.g. Langley v. Comm'r of Soc. Sec.*, No. 1:19–CV–2803, 2021 WL 1185474 (N.D. Ohio Mar. 30, 2021) (noting that while the ALJ's failure to describe the functional limitations of nonsevere impairments at Step Two is a "somewhat technical" fact that distinguished *Langley* and *Emard*, it was nevertheless a critical fact); *Garcia v. Comm'r of Soc. Sec.*, No. 1:19–CV–897, 2020 WL 3620041, *10 (N.D. Ohio Apr. 21, 2020) (including the need for the ALJ to have discussed the functional limitations at Step Two as an element of the *Emard* holding). Although the ALJ here stated that she was bound to follow SSR 96–8p in her narrative of the controlling regulations (ECF No. 12, PageID #: 90), she never discussed what (if any) functional limitations Harrington's chronic vomiting causes. Thus, the fact that the ALJ cited to SSR 96–8p does not on its own demonstrate that she properly considered Harrington's chronic vomiting at subsequent steps in the sequential evaluation process. *Langley*, 2021 WL 1185474, at *2–3.

The Court recognizes that Harrington's chronic vomiting, even when considered in

19

combination with her other severe impairments, may not require additional workplace restrictions. But the ALJ's failure to consider Harrington's chronic vomiting at subsequent steps in the sequential evaluation is a legal error that nevertheless requires remand. *Id.* On remand, the ALJ should explicitly discuss Harrington's chronic vomiting and treatment for that condition. The ALJ should also address the potential that this condition has for absenteeism and being off task when crafting Harrington's RFC. The ALJ must then determine whether Harrington can meet the demands of a significant number of jobs in the national economy, despite all of her limitations. *Kochenour*, 2015 WL 9258609, at *6

*   *   *

Because the Court finds the ALJ's Step Two error requires remand, the Court expresses no opinion on Harrington's other issues.

## VI. Recommendation

Because the ALJ failed to follow proper procedures, her decision is not supported by substantial evidence. Therefore, I recommend that the Commissioner's final decision be REVERSED and REMANDED for further proceedings under Sentence Four of § 405(g).

DATED: July 9, 2021

*Carmen Henderson*
Carmen E. Henderson
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).